## JONATHAN WENTWORTH v. GEORGE A. McDUFFIE.

Plaintiff read to the jury from defendant's memorandum book a passage supposed to be inconsistent with defendant's testimony on the stand: *Held* that this did not entitle defendant to read the entire memorandum, but only so much of it as bore upon or tended to explain what had been read by plaintiff.

The bailor of a mare may maintain trover against the bailee if the bailee wilfully and intentionally drove the mare at such an immoderate and violent rate of speed as seriously to endanger her life, he being at the same time aware of the danger, and the death of the mare (which took place about half an hour after she was returned to the building) being caused thereby.

TROVER for one horse, alleging a conversion July 4th, 1868. At the trial upon the general issue, it appeared that the plaintiff, who was the keeper of a livery stable, let a mare and top-buggy to the defendant on said July 4th, to go from Rochester to Great Falls and Dover, but whether to go further also, and especially to Phinehas Hoit's, the evidence was conflicting. The plaintiff claimed that there was a conversion by driving the mare and buggy to Hoit's, a distance of about two miles from Rochester, when the letting did not authorize him to go

there, and also by driving the mare immoderately so as to cause her death the same day; and the plaintiff's evidence tended to prove that defendant did drive her immoderately on a very hot day, causing her to sweat very profusely, and that when she returned that afternoon to plaintiff's stable in Rochester, she was exhausted and sick, and in about half an hour she died.

The defendant himself was introduced as a witness by his counsel, and on the cross-examination he said he had written down in a memorandum book, the week after July 4th, the facts about his use of the mare, word for word, as he stated it on the stand, and at the request of the plaintiff's counsel he produced it, and the counsel examined it and read from it a passage supposed to be inconsistent with his testimony on the stand; and thereupon defendant's counsel offered to read the entire memorandum. The court ruled that he might read whatever bore upon or tended to explain what had been read by plaintiff's counsel, but not the rest of it, and to this the defendant excepted.

The court instructed the jury, among other things, that mere negligence of an ordinary kind in the use of the mare would not be a conversion; as, if he neglected to feed her properly, or drove her negligently, whereby she was accidentally injured.

That to constitute a conversion while using her on the journey for which she was let, defendant must have committed some positive tortious act in respect to the animal, and, by way of illustration, they were told that if he beat her cruelly with a dangerous instrument,—a heavy club for instance,—and put out an eye or killed her, it would be a conversion; but it would be otherwise if in using the whip in no unusual manner he had put out an eye, or had driven her so that she accidentally fell from a bridge and killed her, even although there might have been negligence on his part.

But if the defendant willfully and intentionally drove the mare at such an immoderate and violent rate of speed as seriously to endanger her life, and he was at the same time aware of the danger, and her death was caused thereby, it would be such a tortious act as would amount to a conversion, and trover might be maintained; though it would be otherwise if the fast driving was the result of mere negligence and want of discretion, he not being aware that it endangered the safety or life of the mare.

To these instructions the defendant excepted, and the jury having returned a verdict for the plaintiff, the defendant moved for a new trial.

*J. N. Worcester*, *Wheeler & Hobbs*, for plaintiff.

*Sanborn* and *Small* for defendant.

SMITH, J.   I. The defendant had the right to refuse to produce his book, except upon the condition that if the plaintiff examined the memorandum it should be read in evidence. *Huckins* v. *Insurance Company*, 31 N. H. 238.   As he did not see fit to annex this condition to the production of the book, the mere fact that plaintiff's coun-

sel examined the book did not, under the rule in this State, make the memorandum evidence. *Austin* v. *Thomson*, 45 N. H. 113. The only ground, therefore, on which the admission of the entire memorandum can be urged is the fact that one passage from it was read to the jury by the plaintiff.

We think the better rule is that proof by one party of a statement made by the other party in a certain conversation does not entitle the latter to give in evidence all the statements made by him in the same conversation which are relevant to the issue, but only so much of them as tends to qualify, limit, or explain the statements proved by his adversary. This subject has been considerably discussed in the books, and the principal reason given for admitting the whole conversation seems to be that this is necessary in order to render the part introduced intelligible and prevent the party from being prejudiced by an extract which would be misunderstood unless the context were supplied. But this reason does not apply to a case where it is conceded that the party has been allowed to introduce all portions of the conversation which bore upon, or tended to explain, the part proved by his adversary. It certainly cannot be necessary to admit the rest of the conversation in order to explain what it has no tendency to explain, and what has already been explained as far as practicable from that source. Undoubtedly in the majority of instances it will be found necessary to allow proof of the whole conversation in order to properly explain the meaning of any part of it. But it is not contended that the case at bar is one of this class. By adopting the rule contended for by defendant the court would in future be saved the trouble of discriminating between what does and does not tend to qualify or explain a portion of a conversation, but the ease of the court can hardly be regarded as sufficient ground on which to establish principles of evidence.

The remarks of *Abbott, C. J.*, in *The Queen's Case*, 2 Brod. & Bing. p. 298, are in point for the defendant; but we are unable to see the injustice there imputed to the rule we have adopted, unless it be assumed that the well settled doctrine, that a party's declarations may be used against him but are not evidence in his own favor, is erroneous and unjust. The practical effect of *Abbott, C. J.'s* rule would be to compel the court to allow evidence to go to the jury which upon general principles is incompetent. " The reason of the thing would rather go to exclude the statements of a party making declarations which cannot be disinterested." *Lord Denman, C. J.*, in *Prince* v. *Samo*, 7 Ad. & El. 627. If the use by plaintiff of a statement made by defendant in a certain conversation entitles defendant to put in other portions of that conversation which do not bear on the meaning of the expressions proved by plaintiff, why should not defendant be equally entitled to prove statements made by himself on any other occasion? But this would be clearly against principle and authority. *Judd* v. *Brentwood*, 46 N. H. 430.

The *dictum* of *Abbott, C. J.*, is overruled in *Prince* v. *Samo*, 7 Ad. & El. 627; which was followed in *Garey* v. *Nichols*, 24 Wendell 350, (sustained by *Rouse* v. *Whithed*, 25 New York 170); and

we prefer to follow the decision in *Prince* v. *Samo*, notwithstanding any authorities seemingly in conflict with it.    So far as the decisions in this State are concerned, the testimony admitted in *State* v. *Winkley*, 14 N. H. 480, seems to have been within the rule laid down in the present case ; and if the language of the court in that case and in *Barker* v. *Barker*, 16 N. H. 333, p. 338–9, goes further, it may be regarded as modified by the recent decision in *Ward* v. *Dow*, 44 N. H. 45.    The statement of *Sawyer, J.*, in *Watson* v. *Walker*, 33 N. H. 131, p. 146, may perhaps be regarded as favorable to the defendant, but the question does not seem to have been carefully considered.

A distinction has been attempted between a conversation and a writing, it being claimed that, although the rule may be otherwise as to conversations, yet that the using part of a writing in evidence entitles the adverse party to put in the whole writing without being confined to passages explanatory of what has been read by the other side.    *Forest* v. *Forest*, 6 Duer 102.    In the present case the memorandum stands substantially on the same footing as the testimony of a witness to a conversation of, defendant's, and we see no solid ground for the attempted distinction.    In practice the instances may be very rare where the entire writing would not be explanatory of the part read, and thus admissible as tending to explain it.    But where, as in the present case, it is admitted on all hands that portions of the writing are not explanatory of the passage read, we know of no reason for admitting those portions of the defendant's written statement, which would not equally justify the admission of all his verbal statements where a portion of them had been proved by his adversary.    " That would be giving his own declarations in evidence in his own favor, upon matters upon which they had not been used against him."    It is very common to allow part only of a writing to be read in evidence, and to withhold the writing itself from the jury.

It will be understood that these views are not in conflict with the rule, that where a party chooses to introduce in evidence a statement of his adversary's, the whole statement thus introduced must be taken together, and is evidence for both parties for all purposes.    The question here is not, what use could the defendant have made of statements in his favor in the memorandum, if the plaintiff had read the whole memorandum to the jury, but how far the plaintiff's reading of part of the memorandum entitles the defendant to read the residue.

Even if the rule of law were as contended by defendant, it might admit of question whether its disregard in this instance had worked such substantial injustice to the defendant as to entitle him to a new trial. The rule would in this case be merely arbitrary, and unsupported by reason ; see *Kritzer* v. *Smith*, 21 Missouri 296, p. 301.

II.    Taking into account the nature of the evidence on which the plaintiff relied, the gist of the instructions excepted to would seem to be contained in the last clause, and we are not inclined to think that the jury were misled by the remarks which preceded that clause.

The jury were instructed that " if the defendant willfully and in-

tentionally drove the mare at such an immoderate and violent rate of speed as seriously to endanger her life, and he was at the same time aware of the danger, and her death was caused thereby, it would be such a tortious act as would amount to a conversion, and trover might be maintained; though it would be otherwise if the fast driving was the result of mere negligence and want of discretion, he not being aware that it endangered the safety or life of the mare."

Two established principles of the law of trover tend to support this instruction. The first is the settled rule in this State, that if the owner of a horse let him to be driven to one place, and the hirer voluntarily drives him beyond that place to another, this is a conversion of the horse, for which the owner may maintain trover against the hirer. *Woodman* v. *Hubbard*, 25 N. H. 67. This doctrine does not seem to proceed upon the idea that the driving the horse beyond the place named in the contract is conclusive evidence of the bailee's intention to convert the animal to his own use, but rather upon the ground that such use of the property is so substantial an invasion of the owner's rights, and so inconsistent with the idea of an existing bailment, that the bailee cannot reasonably object to the bailor's treating the bailment as terminated thereby or to his proceeding against the bailee for a conversion. "A conversion consists in an illegal control of the thing converted, inconsistent with the plaintiff's right of property"; *Perley, J.*, 25 N. H. p. 71. It has been said that, "if the thing be put to a different use from that for which it was bailed", the bailor may maintain trespass or trover, but that "any misuser or abuse of the thing bailed, in the particular use for which the bailment was made, will not enable the general owner to maintain trespass or trover against the bailee"; *Redfield, J.*, in *Swift* v. *Mosely*, 10 Vermont 208, p. 210. But we are unable to perceive any just ground for the distinction as stated in these broad terms. If a horse is hired upon the usual implied contract that he is to be driven at a safe rate of speed, the act of the bailee in willfully and intentionally driving the horse at such an immoderate rate of speed as he knew would seriously endanger the life of the horse is at least as marked an assumption of ownership and as substantial an invasion of the bailor's right of property as the act of driving the horse at a moderate speed one mile beyond the place named in the contract of hiring. The probability of injury to the horse is much greater in the former case, and the cruel treatment of the horse is certainly as inconsistent with the continued existence of the contract of bailment as the use of the horse for a different journey.

The other established principle which tends to support this instruction is the doctrine that the willful destruction by the bailee of the thing bailed is a conversion; see *Morse* v. *Crawford*, 17 Vermont 499. If the death of the mare was caused by an act willfully and intentionally done by the bailee with knowledge on his part that the life of the mare was thereby seriously endangered, we think that, so far as the civil remedy is concerned, the bailee may be regarded as having willfully destroyed the mare. If the property is destroyed by the bailee's willful act the bailor's right to maintain trover cannot depend upon the time

when the destruction is consummated.  "It can make no difference whether the destruction takes place immediately on the commission of the act, or is the necessary result of it."  If the bailor had seen that his mare was about to be destroyed by the bailee's willful act he would have been entitled to terminate the bailment, and retake his property if he could do it without force.  When the bailor learns that an act has already been done which will result in the death of the mare, can he not elect to consider the bailment as having been rescinded by the act at the moment of its commission?

It may be urged that the principles referred to as sustaining the instructions are themselves arbitrary exceptions engrafted on the law of trover, and that they therefore do not furnish a foundation upon which to reason from analogy.  If we are to look merely to the form of the declaration, very few of the actions of trover now brought would be sustained.  The legal fictions which prevail in reference to trover are based upon authority; and however arbitrary the established principles may be, we know of no other test by which to decide any question pertaining to the form of action which has not already been conclusively settled by authority.

The right of a bailor to maintain trespass or trover against a bailee in a case like that supposed in the instructions is a question not conclusively settled by authorities directly in point.  *Rotch* v. *Hawes*, 12 Pick. 136, seems favorable to the defendant.  *M'Neill* v. *Brooks*, 1 Yerger 73, is cited on the same side, but an examination of the opinion shows that the court did not have in mind such a willful and intentional misuse as that described in the instructions given in the present case. *Swift* v. *Moseley*, 10 Vermont 208, contains a *dictum* favorable to the defendant, but the case itself is not in point; see also *Harris, J.*, in *Parker* v. *Thompson*, 5 Sneed 349, p. 352.  On the other hand *Maguyer* v. *Hawthorn*, 2 Harrington 71, tends to sustain the plaintiff; as do also *Campbell* v. *Stokes*, 2 Wend. 139; and *Nelson* v. *Bondurant*, 26 Ala. 341, reaffirmed in *Hall* v. *Goodson*, 32 Ala. 277; see also *James* v. *Carper*, 4 Sneed 397.

We think the instructions were correct.

*Judgment on the verdict.*